IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
No. 3:04 CV 359-H

FILED
CHARLOTTE, N.C.
2004 SEP 24 PM 3:37
U.S. DISTRICT COURT
W. DIST. OF N.C.

| | |
|---|---|
| FC NUTMEG, INCORPORATED, d/b/a INTEGRITY SPORTS MARKETING, MEDIA & MANAGEMENT )<br><br>Plaintiff, )<br><br>v. )<br><br>JACK WARNER, CARIBBEAN FOOTBALL UNION, J.D. INTERNATIONAL )<br><br>Defendants. ) | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiff FC Nutmeg, Incorporated d/b/a Integrity Sports Marketing, Media & Management ("FC Nutmeg") respectfully submits this Memorandum in Opposition to the Motion to Dismiss Complaint for Lack of Personal Jurisdiction filed by Defendants. As shown by the affidavits of Spence G. Millen, Ross Saldarini and Ann Todd, filed in opposition to Defendants' motion and contemporaneously herewith, there are more than enough contacts between Defendants and North Carolina to establish "minimum contacts" under the standards of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154 (1954), and its progeny.

## FACTS

**A.  Background**

Plaintiff FC Nutmeg is a North Carolina corporation with its headquarters and sole place of business in Davidson, North Carolina. (Cplt. ¶ 2; Affidavit of Spence G. Millen, sworn to September 20, 2004 ("Millen Aff.") at ¶ 1.) The company is a sports marketing and management agency which creates, markets and executes on strategies for corporations and sports organizations with an emphasis on soccer. (Cplt. ¶ 2.)



This action arises out of the circumstances in which the Defendants, through defendant Warner, contracted with FC Nutmeg to act as a management consultant in contract renegotiations for certain soccer television properties and to distribute television broadcasts to licensed broadcasters throughout the Caribbean region for the 2003 Additional Events of Fédération Internationale de Football Association ("FIFA"), the worldwide governing body for the sport of soccer. (Cplt. ¶ 1, *passim*; Millen Aff. ¶¶ 15-18.) Defendants have refused to pay FC Nutmeg for that work. (*See id.* at ¶ 21.)

B. **The First Consulting Agreement**

The consulting agreement at issue was actually the second agreement between FC Nutmeg and Defendants. In 2002, Warner initiated contact with FC Nutmeg and then engaged the company to handle the execution of the television rights for the 2002 FIFA World Cup – the premier FIFA event – in the Caribbean nations. (Millen Aff. ¶ 5.) Those rights had initially been purchased in the name of one company controlled by Warner – J.D. International – but were later assigned to another company controlled by him, the Caribbean Football Union ("CFU") in order to obfuscate the ownership of the rights. (*See id.*; Cplt. ¶ 7.) Both entities are alleged to be alter egos and instrumentalities of one another and of Warner (Cplt. ¶¶ 4-5), and those allegations are not contested on this record. FC Nutmeg was retained because neither Warner nor anyone in his organizations was competent to deliver technically the televised programming from the World Cup in Korea and Japan to the approximately 25 Caribbean nations covered by the rights purchased by Warner. (Millen Aff. ¶ 5.)

During the course of that initial engagement, FC Nutmeg performed substantial work for Defendants in North Carolina including preparation for a Caribbean broadcasters summit held in Jamaica, (Millen Aff. ¶ 9) and the handling of significant broadcasting logistics from North

2

Carolina (*id.* at ¶ 11; *see also* Affidavit of Ann Todd, sworn to September 21, 2004 ("Todd Aff."), at ¶¶ 4-11.) Among other things, Ms. Todd – on behalf of FC Nutmeg and from its offices in Davidson, North Carolina – provided information and documentation to the Caribbean broadcasters, communicated with the FIFA rightsholder, produced informational newsletters, purchased and distributed satellite signal equipment, combated signal piracy, and engaged in troubleshooting satellite signal and sound problems. (Todd Aff. ¶¶ 4-11.)

At all pertinent times, it should have been obvious that FC Nutmeg was located in North Carolina and doing its work from there. Among other things, dozens of emails sent by Millen to Warner included a signature block which listed the company's business address in Davidson. (Millen Aff. ¶ 6). Moreover, all mailed and faxed correspondence from FC Nutmeg to Warner contained the company's name and address. In addition, Warner arranged for the credentialing of FC Nutmeg personnel at the World Cup which required him to verify that the company was Defendants' agent and to verify its physical address to FIFA. (*Id.* at ¶ 13 & Ex. A.) FC Nutmeg also purchased technical equipment for the CFU shipped from the equipment maker to Trinidad, but billed to FC Nutmeg which was reimbursed by Warner from Trinidad to FC Nutmeg's bank account in North Carolina. (*Id.* & Ex. B.)

At the conclusion of the World Cup, Warner paid FC Nutmeg $95,000 for work performed as well expenses to FC Nutmeg's North Carolina bank account. (Millen Aff. ¶ 12.) When the World Cup events were over, Warner sent by facsimile a memorandum on the letterhead of the CFU to the offices of FC Nutmeg in North Carolina on July 2, 2002. In that memorandum, Warner stated that it was "a pleasure for us at Caribbean Football Union to have worked with you and your team at Integrity Sports in the successful delivery of the FIFA World Cup television signals to broadcasters in the Caribbean." (*Id.* at ¶ 14 & Ex. C.)

3

## C. The Second Consulting Agreement

Later in 2002, Warner determined that the rights fee he had agreed to pay for the Caribbean broadcasts of the FIFA Additional Events was excessive. (Millen Aff. ¶ 15.) This led to a second consulting agreement between FC Nutmeg and Defendants. Specifically, Warner asked FC Nutmeg to consult with him and the CFU to create a case and strategy for the renegotiation of the contract between the CFU and the rightsholder representing FIFA. (*Id.*) Warner instructed FC Nutmeg to undertake these actions in a letter from Warner emailed to North Carolina in November 2002. (*Id.* & Ex. D.) Warner agreed to pay FC Nutmeg $100,000 for its services. (*Id.* at ¶ 16.)

As a result of the efforts of FC Nutmeg, Warner was able to renegotiate a new contract resulting in nearly a million dollars in savings to Defendants. (Millen Aff. ¶ 17.) Thereafter, FC Nutmeg, primarily from its offices in Davidson, and among other things, created a Piracy and Territorial Spillover Report, a Potential Caribbean Broadcasters List, a CD for sales and a sales and logistics plan, and sent newsletters – created in North Carolina and sent from this State – to the CFU broadcasters in the Caribbean. (*Id.* at ¶ 18.)

Any contention that Warner was unaware that these activities were taking place on his behalf in North Carolina is belied by a substantial written record. Among other things, the report entitled "Combating Piracy and Territorial Spillover in the Caribbean" was prepared in North Carolina and sent to Warner and the CFU in Trinidad from North Carolina. (Todd Aff. ¶ 23.) It states on its first page that it was "Prepared for the Exclusive Internal Use of IS3M [FC Nutmeg's d/b/a Integrity Sports Marketing, Media & Management], Jack Warner and the CFU" and includes FC Nutmeg's Davidson address on that first page. (*Id.* & Ex. G.) The sales disks were sent to CFU for distribution from North Carolina as reflected on the shipper's invoice. (*Id.*

4

at ¶ 17 & Ex. C.) The broadcasters list was created in North Carolina and emailed from North Carolina to Warner with a signature block indicating FC Nutmeg's North Carolina address. (*Id.* at ¶ 18 & Ex. D.) The list itself contains FC Nutmeg's address on its first page. (*Id.* & Ex. E.) Warner also went through the same credentialing process for the FIFA Additional Events, requiring the verification of FC Nutmeg's address to FIFA. (Millen Aff. ¶ 20 & Ex. F.)

During the period prior to the broadcast of the FIFA Additional Events, Ms. Todd actually paid the satellite provider for test time from her own North Carolina bank account after Warner failed to make the payment. (Todd Aff. ¶ 20.) Thereafter, Warner reimbursed Ms. Todd by wiring her North Carolina bank account. (*Id.* & Ex. F.) As with the World Cup, Ms. Todd handled all of the technical and logistical issues relating to the broadcast from North Carolina. (Todd Aff. ¶¶ 19, 21-22, 24.) Over the course of providing these services, Warner frequently contacted Mr. Millen by telephone and email in North Carolina. (Millen Aff. ¶ 21.)

**D.** <u>**Warner's Earlier Consulting Agreement with Millen's Other Company**</u>

In their motion, Defendants entirely fail to mention another significant contact between Warner and North Carolina that pre-dates the two consulting agreements between Defendants and FC Nutmeg. In fact, Warner was retained as a consultant by another North Carolina company founded by Mr. Millen, internetsoccer.com, an affiliate of FC Nutmeg. (Millen Aff. ¶¶ 3-4.) Over the course of 2000 and 2001, Warner was paid over $64,000 from that company's North Carolina bank account. (Affidavit of Ross Saldarini, sworn to September 16, 2004, at ¶¶ 2-5; Millen Aff. ¶¶ 3-4.) That relationship (and those payments) also belie any claim that Warner was unaware that he was contracting with entities in North Carolina.

# ARGUMENT

## NORTH CAROLINA CLEARLY HAS PERSONAL JURISDICTION OVER DEFENDANTS AND THEIR MOTION TO DISMISS MUST BE DENIED.

As this Court has held, to survive Defendant's motion to dismiss, FC Nutmeg "must make a prima facie showing that the North Carolina long-arm statute, N.C.Gen.Stat. § 1-75.4, confers personal jurisdiction over Defendant[s] and that the Defendant[s have] sufficient minimum contacts with North Carolina to comport with the requirements of due process." *A.B. Carter, Inc. v. Fabric Resources International, Ltd.*, 1999 WL 3329114 (Apr. 14, 1999) at *1 (citing *Vishay Intertechnology, Inc. v. Delta International Corp.*, 696 F.2d 1062, 1064 (4th Cir. 1982)). In "considering the motion to dismiss on the record, 'the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *Id.* (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).)

### A. The Long-Arm Statute Confers Jurisdiction Over Defendants.

Section 1-75.4 of the North Carolina General Statutes, known as the long-arm statute, should receive "liberal construction, favoring the finding of jurisdiction." *Starco, Inc. v. AMG Bonding and Ins. Services, Inc.*, 124 N.C.App. 332, 338, 477 S.E.2d 211, 216 (1996).[1] North Carolina clearly has jurisdiction over Defendants pursuant to N.C.G.S. §§ 1-75.4(5)(a) and 1-75.4(5)(b).

Section 1-75.4(5) provides for jurisdiction where the action arises out of a promise made anywhere to the plaintiff by the defendant to pay for services to be performed in North Carolina

---

[1] In fact, this Court has held that because the North Carolina long-arm statute has been interpreted as a legislative attempt "to allow the exercise of personal jurisdiction in all cases where such jurisdiction does not contravene due process," the two-step inquiry is in reality a one-step inquiry. *Jim Myers & Son, Inc. v. Motion Industries, Inc.*, 140 F.Supp.2d 595, 599 (W.D.N.C. 2001).

6

or which arises from services actually performed for the defendant within North Carolina, if the performance was authorized or ratified by the defendant. *See* N.C.G.S. § 1-75.4(5)(a)-(b). This action stems from a dispute arising out of a consulting services agreement made between a resident North Carolina corporation, FC Nutmeg, and the non-resident Defendants.[2] (Cplt. ¶¶ 11-18; Millen Aff. ¶ 15-16.) FC Nutmeg performed these services at the request of Defendants. (*See* Millen Aff. ¶¶ 15-16 & Ex. D.) As detailed thoroughly in the Millen Affidavit and the Todd Affidavit, the bulk of the services provided pursuant to the agreement were performed in North Carolina and there could be no mistaking FC Nutmeg's North Carolina location. The foregoing facts clearly show Defendants' promise to pay FC Nutmeg for the services that FC Nutmeg was providing from North Carolina – and, indeed the record shows an earlier payment to FC Nutmeg in North Carolina pursuant to the first consulting agreement (Millen Aff. ¶ 12) – and the record provides clear evidence that FC Nutmeg's performance of the services was authorized by Defendants. Accordingly, jurisdiction over Defendants under the North Carolina long-arm statute clearly exists. *See also Starco Inc. v. AMG Bonding and Ins. Services, Inc.*, 124 N.C.App. 332, 339, 477 S.E.2d 211, 216 (1996) (holding that the North Carolina long-arm statute covered a nonresident defendant that made promises to a North Carolina resident who then performed based on those promises).

**B.     Defendants By Their Own Actions Have Created Minimum Contacts With The State Of North Carolina.**

---

2 As noted above, the complaint alleged that Warner, J.D. International and the CFU were alter egos of one another and Defendants made no effort to contest those allegations on the record. Thus, those allegations should be deemed true and controlling and the jurisdictional allegations should be applied against all Defendants. *See, e.g., Inspirational Network, Inc. v. Combs*, 131 N.C.App. 231, 237-38, 506 S.E.2d 754, 759 (1998) (accepting alter ego allegations in finding of personal jurisdiction relating to the provision of broadcasting services in North Carolina).

7
RALEIGH 486659v2

To satisfy the due process clause of the fourteenth amendment certain "minimum contacts" between the non-resident defendant and the forum must exist such that the maintenance of the suit does not offend "'traditional notions of fair play and substantial justice.'" *See Tom Togs, Inc. v. Ben Elias Industries, Corp.*, 318 N.C. 361, 365, 348 S.E.2d 782, 786 (*citing International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945)). There must be some act by which the defendant "purposefully avails himself of the privileges" of the forum state and "invokes the benefits of its laws." *See id.* The defendant should "reasonably anticipate being haled into court" in the forum state. *See id.* (*citing World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567 (1980)).

In the words of the *Starco* court, "[i]n light of modern business practices, the quantity, or even the absence, of actual physical contacts with the forum state merely constitutes a factor to be considered and is not controlling in determining whether minimum contacts exist." 124 N.C.App. at 340, 477 S.E.2d at 211. As this Court has held, a party who contracts with a North Carolina company for work to be performed in North Carolina "purposefully avail[s] itself of the benefits and protections of North Carolina's laws." *Jim Myers & Son, Inc.*, 140 F.Supp.2d at 601. In that case, this Court held that "by purposefully contracting with a supplier that [third-party defendant] *knew* was based in North Carolina, it had fair warning that it might be subject to litigation in this forum." *Id.* (emphasis in original). Moreover, even "a single contract may be a sufficient basis for the exercise of *in personam* jurisdiction if it has a substantial connection with this State." *Climatological Consulting Corp. v. Trattner*, 105 N.C.App. 669, 673, 414 S.E.2d 382, 384 (1992), *cert. denied*, 332 N.C. 343, 421 S.E.2d 145 (1992).

North Carolina courts use three primary factors to determine whether minimum contacts exist: 1) the quantity of the contacts, (2) the nature and quality of the contacts, and (3) the source

8

and connection of the cause of action with these contacts. *See B.F. Goodrich Co. v. Tire King of Greensboro, Inc.*, 80 N.C.App. 129, 132, 341 S.E.2d 65, 67 (1986). Two secondary factors are also considered; they are the interest of the forum state and the convenience of the parties. *See id.* No single factor controls. *See id.*

An analysis of these factors shows that this Court clearly has jurisdiction over Defendants. Defendants solicited FC Nutmeg by requesting that it perform the work in connection with the second consulting agreement, namely the renegotiation of the broadcast rights and the performance of the technical services necessary to deliver the broadcasts. (Millen Aff. ¶ 15 & Ex. D.) At the time of that solicitation, Defendants were well aware of FC Nutmeg's location in North Carolina. (Millen Aff. ¶¶ 3-4, 6, 12-13.) Indeed, Warner, only a few months earlier, had sent a facsimile to FC Nutmeg in North Carolina on CFU letterhead thanking FC Nutmeg for its work on the first consulting agreement. (Millen Aff. ¶ 14 & Ex. C.) During the following months, the work product that FC Nutmeg sent from North Carolina uniformly indicated that it was from FC Nutmeg's office in Davidson. (*See* Todd Aff., Exs. C-E.) Warner reimbursed Ms. Todd for payments to the satellite company in North Carolina (Todd Aff. ¶ 20 & Ex. F), just as he had previously paid the company in North Carolina. (Millen Aff. ¶ 12.)

This conclusion is supported by case law. It is well established that a single contract may provide sufficient contact with a state to establish jurisdiction over the nonresident defendant if the contract has a "substantial connection" to North Carolina. *See Tom Togs, Inc.*, 318 N.C. at 367, 348 S.E.2d at 787. When a contract is to be performed in North Carolina, such contact is "sufficiently substantial" to confer jurisdiction over a nonresident corporation. *Harrelson Rubber Co. v. Dixie Tire and Fuels, Inc.*, 62 N.C.App. 450, 453-454, 302 S.E.2d 919, 921 (1983) (holding where a contract is made *or* to be performed in North Carolina, such contact is

9

sufficiently substantial to confer jurisdiction). Here, FC Nutmeg performed the services required under the agreement from North Carolina and shipped significant work product to Defendants from North Carolina. In *Harrelson Rubber Co.*, shipment of marketing and other materials to defendant was held sufficient to confer jurisdiction, 69 N.C.App. at 580, 317 S.E.2d at 739, and the "fact that defendant never was physically present in this state should not control." *Id.* at 586, 317 S.E.2d at 743. Here therefore, the performance of the agreement provides "sufficiently substantial" contact and this Court has jurisdiction over Defendants.

Moreover, when Defendants solicited FC Nutmeg to perform the second consulting agreement, they "purposefully availed [themselves] of the benefits and laws of North Carolina. *See Starco, Inc.*, 124 N.C.App. at 340, 477 S.E.2d at 217 (when defendant contacted a North Carolina businessman to solicit assistance and engaged in a business transaction with defendant, it purposefully availed itself of "the benefits and laws of our fair state"). Further, North Carolina has a "manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by nonresidents who seek services offered by North Carolina professionals." *Climatological Consulting Corp.*, 105 N.C.App. at 675, 414 S.E.2d at 385; *Chapman v. Janko, U.S.A., Inc.*, 120 N.C.App. 371, 376, 462 S.E.2d 534, 538 (1995) (defendant should not "be surprised with being haled into a North Carolina court" where defendant failed to "compensate plaintiff for services provided"); *see also Starco, Inc.* 124 N.C. App. at 340, 477 S.E.2d at 217; *B.F.Goodrich Co.*, 80 N.C. App. at 133, 341 S.E.2d at 68. Finally, "[l]itigation on interstate business transactions inevitably involves inconvenience to one of the parties." *Harrelson Rubber Co.*, 69 N.C.App. at 587, 317 S.E.2d at 743. The same is true in international transactions. The inconvenience to Defendants of litigating in North Carolina is no greater than would be the inconvenience to FC Nutmeg of litigating in Trinidad. *See id.*, 317 S.E.2d at 743.

10

A finding of jurisdiction, moreover, is mandated by existing case law arising in similar factual settings. In *Trattner*, the defendant, a lawyer from Maryland, contacted plaintiff regarding the provision of expert weather consulting in connection with one of his client's claims. *See id.* at 671, 414 S.E.2d at 383. Plaintiff sued the nonresident defendant for failure to pay for services rendered. *See id.* In affirming the trial court's finding of jurisdiction, the North Carolina court of appeals observed that the defendant initially contacted the plaintiff and that 80% of the services were performed in North Carolina. *See id.* at 674, 414 S.E.2d at 384-385. Under those facts, the contract "had substantial connections with this state and defendant purposefully availed himself of the protection and benefit of our laws." *Id. See also Chapman*, 120 N.C. App. at 376, 462 S.E.2d at 538 (finding of jurisdiction where plaintifff met and consulted with defendant at defendant's request, spent considerable time and energy in North Carolina engineering and designing a computer system, went to defendant's offices in South Carolina, and received phone calls from defendant in South Carolina).

The facts in the case at bar are even more compelling than those of *Trattner* and *Chapman*. Defendants solicited the services of FC Nutmeg and entered into an agreement with the knowledge that the vast majority of the services were to be performed in North Carolina. Therefore, under *Trattner* and *Chapman*, this Court has jurisdiction over Defendants and their motion to dismiss should be denied.

## CONCLUSION

For the foregoing reasons, FC Nutmeg respectfully requests that this Court deny Defendants' motion to dismiss for lack of personal jurisdiction.

This the 23rd day of September, 2004.

*M. Todd Sull* 
M. Todd Sullivan

State Bar No. 24554

OF COUNSEL:

WOMBLE CARLYLE SANDRIDGE & RICE,
*a Professional Limited Liability Company*
Post Office Box 831
Raleigh, North Carolina 27602
(919) 755-2100

Attorneys for Plaintiff
FC Nutmeg, Incorporated

# CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing in the above-captioned action upon all parties by depositing a copy of same in the United States Mail, first-class postage prepaid, addressed as follows:

Christian R. Troy, Esq.
Troy & Watson
301 McDowell Street
Suite 1014
Charlotte, N.C. 28204

This the 23rd day of September, 2004.

M. Todd Sullivan
State Bar No. ~~29421~~ 24554

13

RALEIGH 486659v2